1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

| | |
|---|---|
| JOSEPH ESHOM, | CASE NO. 2:24-cv-00007-JNW |
| Plaintiff, | ORDER GRANTING SUMMARY JUDGMENT |
| v. | |
| KING COUNTY, a Washington municipal corporation, | |
| Defendant. | |
| JENIFER ESHOM, | CASE NO. 2:23-cv-00028-JNW |
| Plaintiff, | |
| v. | |
| KING COUNTY, a Washington municipal corporation, | |
| Defendant. | |

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

ORDER GRANTING SUMMARY JUDGMENT - 1

## 1.  INTRODUCTION

This matter comes before the Court on Defendant King County's Motion for Summary Judgment, Dkt. No. 28, and motion for sanctions, Dkt. No. 52.[1]

Former King County deputy sheriffs and husband and wife Jenifer and Joseph Eshom were fired in 2022 for refusing the COVID-19 vaccine in violation of the County's vaccine mandate. They claim religious objections to vaccines developed using fetal cells and seek relief under state and federal civil rights laws, arguing the County should have allowed them to work unvaccinated with alternative safety measures.

The Eshoms were among over 80 sheriff's deputies who sought religious exemptions from the County's vaccine mandate. The County denied all such requests, determining that deputies' essential law enforcement duties required close contact with the public and colleagues, making vaccination critical to fulfilling the law enforcement mission of the sheriff's department during the pandemic.

Federal courts in this district have repeatedly upheld similar denials, and the Ninth Circuit recently affirmed in *Petersen v. Snohomish Reg'l Fire & Rescue* that

---

[1] These cases have been consolidated for summary judgment and Daubert motions. *See* Joseph Eshom v. King County, No. 2:24-cv-00007 (W.D. Wash. July 2, 2025), Dkt. No. 44. Because the Parties have filed identical briefs and supporting materials to the dockets in both cases, all references to the record made in this Order will reflect the docket entries in Case No. 2:24-cv-00007. *Compare* Defendant's Motion for Summary Judgment, Jenifer Eshom v. King County, No. 2:23-cv-00028 (W.D. Wash. June 4, 2025), Dkt. No. 49 *with* Defendant's Motion for Summary Judgment, Joseph Eshom v. King County, No. 2:24-cv-00007 (W.D. Wash. June 4, 2025), Dkt. No. 28.

public safety employers may deny religious accommodations when unvaccinated employees would pose substantial risks.

While substantial evidence suggests the Eshoms' objections were primarily secular—including their continued use of other medications tested on fetal cell lines—the Court need not resolve the sincerity question. King County has demonstrated that accommodating 80+ unvaccinated deputies would have imposed an undue hardship on the sheriff's department through increased health risks and disruption to its law enforcement mission.

Accordingly, the County's motion for summary judgment is GRANTED. Dkt. No. 28 The County's motion for sanctions is thus DENIED as moot. Dkt. No. 52.

## 2.  BACKGROUND

The following facts are either not genuinely disputed or taken in the light most favorable to the Eshoms as the non-moving parties.

### 2.1  The COVID-19 pandemic ravages Washington.

On January 20, 2020, the U.S. Centers for Disease Control & Prevention (CDC) and the Washington State Department of Health (DOH) announced the first confirmed case of COVID-19 in the United States in Snohomish County, Washington. Dkt. No. 30-1 ¶ 9. Within two weeks, both the World Health Organization and then-U.S. Health and Human Services Secretary Alex M. Azar II declared the COVID-19 pandemic a public health emergency. *Id.* ¶ 10. Over the coming year, the public health community worked to design and implement prophylactic measures aimed at curtailing the spread of the virus, including

1   "lockdown" or "stay home" policies, masking, testing requirements, and social

2   distancing. *Id.* ¶ 11. Despite these efforts, the virus continued to tear through the

3   country. COVID-19 hospitalization in the United States peaked in January 2021,

4   when 21 out of every 100,000 people in the country were in the hospital at one

5   time. *Id.* ¶ 12. Washington was no exception: during 2020, there were 262,516

6   COVID-19 cases reported in Washington; 15,667 of those cases were hospitalized;

7   and 4,461 of those cases—including 1,156 residents of King County—died. Dkt. Nos.

8   30-11 at 4; 30-12 at 4. By then, scientists and public health officials agreed that

9   developing an effective COVID-19 vaccine was key to reducing mortality,

10  hospitalizations, and lockdown measures. *See* Dkt. No. 30-1 at 13.

11       Scientists began working to develop vaccines against COVID-19 in January

12  2020. Dkt. No. 30-1 ¶ 14. The first vaccines—developed by Pfizer/BioNTech and

13  Moderna TX, Inc.—were granted emergency-use authorization by the Food and

14  Drug Administration in December 2020. *Id.* ¶¶ 15–16. A third vaccine developed by

15  Janssen (Johnson & Johnson) was developed in late February 2021. *Id.* ¶ 17. After

16  rigorous testing, by Summer 2022, the FDA approved the Pfizer and Moderna

17  vaccines for the prevention of COVID-19 in nearly all use cases, including children

18  and pregnant people. *Id.* ¶¶ 25–29. Both the Pfizer and Moderna vaccines used

19  HEK293 cells—immortalized human embryonic kidney cells that were isolated in

20  the 1970s—in their testing[2] but were not used to produce either vaccine. *Id.* ¶ 69.

21

22  ────────────

23  [2] HEK293 cells have been used in this same capacity to test a wide range of
    commonplace over-the-counter medicines, including acetaminophen (Tylenol),
    acetylsalicylic acid (aspirin), and ibuprofen (Advil). Dkt. No. 30-1 ¶ 69, n.105.

1    By 2022, researchers estimated that the COVID-19 vaccines in the United States

2    prevented over 3 million deaths and 18 million hospitalizations. *Id.* ¶ 51.

3        But while the vaccines were deployed, COVID-19 continued to evolve into

4    new and more contagious variants. By summer 2021, the Delta variant of COVID-

5    19 was surging in Washington and elsewhere in the United States. Dkt. No. 30-1 ¶

6    51. Compared to previous variants, Delta was more infectious and caused longer,

7    deadlier illnesses, particularly among unvaccinated individuals. *Id.* ¶ 55. By

8    September 2021, 95% of hospitalized patients in Washington were unvaccinated

9    individuals. *Id.* ¶ 54.

10       By late 2021, researchers and scientists began to better understand the

11   infectious nature and mechanisms of COVID-19. The medical community

12   determined that the virus was not "droplet-mediated" (i.e., transmitted through

13   saliva) but rather spread through aerosolization, implying that infections could

14   occur over greater distances and could linger in spaces previously inhabited by

15   infected individuals. Dkt. No. 30-1 ¶ 60. At that time, working outside or in a large

16   indoor space was not clearly shown to decrease risk of infection. *Id.* For example,

17   despite often working outdoors on a beat, police officers had some of the highest

18   risks of exposure and infection to COVID-19, which was the leading cause of police

19   officer deaths in 2020, 2021, and 2022. *Id.* Throughout this time, the prevailing

20   medical opinion was (and remains) that vaccination was the most important and

21   effective public health measure employed to combat COVID-19. *Id.* ¶ 62.

22

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**2.2    King County issues mandate requiring employees to be vaccinated against COVID-19 but allows for employees to request religious exemptions and accommodations.**

On August 9, 2021, Washington Governor Jay Inslee issued a proclamation that would prohibit most state employees—including law enforcement officers—from working after October 18, 2021, without being vaccinated against COVID-19. *See* Dkt. No. 30-20. The next day, King County Executive Dow Constantine issued Executive Order ACO-8-27-EO (the "EO"), stating it was "imperative that all King County Executive Branch employees be vaccinated to stop the spread of COVID-19." Dkt. No. 31-2. The EO set October 18, 2021, as the deadline for employees to be fully vaccinated against COVID-19, and added that "employees may be entitled under law to a disability-related reasonable accommodation or a sincerely held religious belief accommodation." *Id.*

As employees of the King County Sheriff's Office (KCSO), both Plaintiffs were subject to the County's vaccine requirements. The couple had different roles and responsibilities within KCSO. Ms. Eshom worked as a detective in KCSO's Sexual Assault Unit (SAU), where she was expected to travel to hospitals, homes, offices, and other indoor settings to collect evidence, interview victims, witnesses, suspects, and otherwise execute search and arrest warrants. Dkt. No. 29 ¶ 17. Mr. Eshom worked mostly with the federal Bureau of Alcohol Tobacco and Firearms (ATF) as a Federal Task Force Officer (TFO). In this role, Mr. Eshom was a KCSO detective assigned to work with ATF on a long-term basis to investigate violent and organized crime in Washington, including King County. Dkt. No. 29 ¶¶ 33–35.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

When Executive Constantine issued the EO, King County created a centralized process for (1) employee requests for exemptions from the vaccine requirements, and (2) effective and efficient evaluation of those requests by the King County Department of Human Resources (DHR). Dkt. No. 31 ¶ 9. Exemption requests based on the employee's religious beliefs first went to a committee to evaluate whether the employee's request stated "a bona fide religious belief that conflicted with vaccination against COVID-19." *Id.* ¶ 10. Most, if not all, exemption requests were accepted "[s]o long as the employee invoked beliefs or reasons that seemed religious in nature" even when those beliefs were "generalized or amorphous." *Id.* ¶¶ 11–12. Upon acceptance, the employee, management within the employee's department, and DHR would engage in an interactive process which "considered the essential functions of each employee's position, the requested accommodations, and other relevant information" to determine whether the requested accommodations "could be reasonably accommodated without undue hardship to the County." *Id.* ¶¶ 10, 12. These determinations were then reviewed by a third committee to "ensure consistency in accommodations decisions across County departments. *Id.* ¶ 13.

**2.3    Plaintiffs request exemptions from the vaccine mandate citing their religious concerns with the COVID-19 vaccines.**

Plaintiffs, along with 80+ other KCSO deputies, requested religious accommodations related to the vaccine requirement. Dkt. No. 31 ¶ 16. Plaintiffs requested their exemptions on around September 12, 2021. *See* Dkt. No. 29 ¶¶ 13, 29, Exs. G, M. Both submitted their requests to the committees, both were moved

into the interactive accommodation process, and both chose to complete that process by submitting written responses rather than participating in a virtual meeting. *Id.* ¶¶ 13–14, 29–30.

Plaintiffs' written objections to the vaccine mandate raised a pair of similar concerns. First, under the belief that fetal cells were used in the development of the vaccines, Plaintiffs asserted that the vaccine conflicted with their religious beliefs opposing abortion. Ms. Eshom wrote that a "bedrock principle" of her Christian faith is her belief that "life begins at conception . . . and so any abortion, any destruction of those cells thereafter . . . is a destruction of human life." Dkt. No. 29-7 at 6. She surmised that because the Pfizer and Moderna vaccines contained HEK293 cell lines, it would be "a direct violation of ALL [sic] [her] religious beliefs to inject anything containing aborted cells of a baby into my blood," or otherwise "knowingly use a vaccine that used the cells of aborted babies in its development." *Id.* Similarly, Mr. Eshom claimed that "abortion is wrong" because "[t]he sixth Commandment from God states 'You shall not murder'." Dkt. No. 29-13 at 7. He referred to "a deeply held belief that these vaccines violate" his faith in "God and the principles laid out in [God's] words." *Id.*

Second, both Plaintiffs objected on the grounds that the vaccine were "impure" or "unclean," which would violate their spiritual mandate to remain physically pure (the "body is a temple" objection). In her medical exemption, Ms. Eshom wrote that she "strives to practice purity of body" and it would violate her religious beliefs to "inject anything containing aborted cells of a baby into my body," as it would be "impure." Dkt. No. 29-7 at 6. Mr. Eshom wrote on his exemption

1   request that the vaccines were a "mechanism for altering [his] God given body," and

2   were the "equivalent of a prohibited 'unclean food' that causes harm to [his]

3   conscience." Dkt. No. 29-13 at 7.

4   **2.4    KCSO denies Plaintiffs' accommodation requests and terminates
           their employment for violating the vaccine mandate.**

5

6            Citing their religious beliefs, Plaintiffs requested to continue working

7   unvaccinated if they masked, social distanced, and tested frequently. Dkt. No. 29–7

8   at 7; Dkt. No. 29-13 at 8. Ms. Eshom further requested that, if she ever developed

9   any symptoms, that she be allowed to remain at home and follow quarantine

10  guidelines, Dkt. No. 29–7 at 7, and Mr. Eshom requested the "opportunity to be

11  tested for Covid-19 at the onset of symptoms or exposure." Dkt. No. 29-13 at 8.

12           Like every other KCSO deputy sheriff who sought religious accommodations,

13  Plaintiffs' requests were denied. Dkt. Nos. 29 ¶¶ 26, 43. Plaintiffs received notice of

14  that denial in January 2022 by U.S. mail and email. Dkt. Nos. 29-10; 29-16. The

15  notice read, in part, as follows:

16           After considering the information detailed above, your particular job
             functions, the risk that unvaccinated employees present to the health
17           and safety of our employees and the public, and the County's
             responsibility to provide a safe workplace, it was determined that a
18           reasonable accommodation from the COVID-19 vaccine mandate is not
             available . . . that would sufficiently mitigate or eliminate the risk
19           associated with an unvaccinated employee performing the essential
             functions of your position.

20  *Id.* Plaintiffs were given "14 days to begin the vaccination process," and informed

21  that failure to do so "will result in involuntary non-disciplinary separation." *Id.*

22

23

ORDER GRANTING SUMMARY JUDGMENT - 9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Plaintiffs did not receive the COVID-19 vaccine and so were informed by KCSO that their employment would be terminated due to their non-compliance with the mandate. Dkt. No. 29-11; Dkt. No. 29-17. Prior to their termination being finalized, Plaintiffs were given a "fair opportunity to voice their objections" to their terminations through a *Loudermill* hearing. Dkt. Nos. 32-1 at 79–80; 32-5 at 10; 29 ¶¶ 27, 44. Mr. Eshom participated in two *Loudermill* hearings; Ms. Eshom participated in one. Dkt. Nos. 29-11; 29-17. As a result of the notice and hearing process, Mr. Eshom was involuntarily separated from his employment with the County on March 14, 2022. Dkt. No. 29-17. Ms. Eshom was involuntarily separated shortly thereafter, on April 1, 2022. Dkt. No. 29-11.

## 2.5    Procedural History

Plaintiffs filed separate lawsuits in King County Superior Court, alleging that their termination violated state and federal discrimination laws and that the County infringed their constitutional rights. Dkt. No. 1-1. The County timely removed both cases to federal court. Dkt. No. 1.

## 3.   DISCUSSION

## 3.1    Legal standard.

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,*

1
2
3
4

*Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, the court must view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Hawai'i Disability Rts. Ctr. v. Kishimoto*, 122 F.4th 353, 363 (9th Cir. 2024).

5

### 3.2    Failure to accommodate under Title VII and the WLAD.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Plaintiffs claim the County violated Title VII, 42 U.S.C. §§ 2000e–2(a)(1), and the Washington Law Against Discrimination (WLAD), RCW 49.60, by failing to accommodate their religious beliefs. "Claims of failure to accommodate a religious objection are analyzed under a burden-shifting framework." *Detwiler v. Mid-Columbia Med. Ctr.*, --- F.4th ----, No. 23-3710, 2025 WL 2700000, at *5 (9th Cir. Sept. 23, 2025) (citing *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1222 (9th Cir. 2023)); *see also Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 197 (Wash. 2014) (religious failure-to-accommodate claims under WLAD are analyzed under federal framework). This framework consists of two steps. First, the plaintiff must "plead a prima facie case of failure to accommodate [their] religion . . . by demonstrating "(1) [they] had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) [they] informed [their] employer of the belief and conflict; and (3) the employer threatened [them] with or subjected [them] to discriminatory treatment, including discharge, because of [them] inability to fulfill the job requirements." *Id.* (citing *Bolden-Hardge*, 63 F.4th at 1222; *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993)). When an employee seeks an accommodation, they must plead facts sufficient to show the accommodation

request also springs from a bona fide religious belief. *Id.* (citing *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682–83 (9th Cir. 1998)).

Second, after the plaintiff "makes out a prima facie failure-to-accommodate case, the burden then shifts to [the employer] to show that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1216 (9th Cir. 2025) (quoting *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)) (alterations in original).

The County moves for summary judgment on the Eshoms' religious accommodation claims, arguing that they "can[not] state a prima facie failure to accommodate claim because their convictions in conflict with the vaccine mandate were secular and thus nonreligious." Dkt. No. 49 at 21. The County also argues that, even if the Eshoms manage to establish a prima facie case, "[g]ranting the accommodations requested by the Eshoms indisputably would have caused the County to suffer undue hardship[.]" *Id.* at 27. The Court addresses each of the County's arguments in turn.

### 3.2.1 Genuine disputes of material fact exist about the sincerity of Plaintiffs' bona fide religious beliefs.

The County argues Plaintiffs cannot show an "actual conflict" between their religious beliefs and the vaccine mandate because their objections were mainly secular in nature. Dkt. No. 28 at 13. Evaluating religious beliefs is a "delicate inquiry." *Detwiler*, 2025 WL 2700000, at *5. On the one hand, to prevent "religious

labels from becoming carte blanche to ignore any obligation," courts "need not

accept entirely conclusory assertions of religious belief," but on the other, courts

may neither "substitute their own judgment for that of the believer's" nor "adjudge

the reasonableness of a belief under the guise of a purely legal assessment of the

sufficiency of the claim." *Id.* at *6 (internal citations and quotations omitted).

Plaintiffs must "connect the requested exemption with a truly religious principle,"

as "[i]nvocations of broad, religious tenets cannot, on their own, convert a secular

preference into a religious conviction." *Id.* But "'religious beliefs need not be

acceptable, logical, consistent, or comprehensible to others in order to merit'"

protections under Title VII. *Id.* (quoting *Thomas v. Rev. Bd.*, 450 U.S. 707, 714

(1981)); *see also Keene v. City & Cnty. of San Francisco*, 2023 WL 3451687, at *2

(9th Cir. May 15, 2023) ("A religious belief need not be consistent or rational to be

protected under Title VII, and an assertion of a sincere religious belief is generally

accepted.").

     Both Plaintiffs articulated facially religious objections grounded in Biblical

teachings. Ms. Eshom testified that she identifies as a "Christian woman" who

"follow[s] the commandments of the Bible," and, as such, "believes that life begins at

conception . . . and so any abortion, any destruction of those cells thereafter" is in

violation of those beliefs.[3] Dkt. No. 32-1 at 30, 32, 70. She also cited to scripture for

the proposition that her body "is a temple of the Holy Spirit" which counseled her

---

[3] Ms. Eshom's objections discussed her Shinto beliefs, but she admits that those
practices are not religious but "cultural." Dkt. No. 32-1 at 29–30. The Court notes
that purely *cultural* beliefs cannot be the basis for a *religious* failure-to-
accommodate claim under Title VII.

ORDER GRANTING SUMMARY JUDGMENT - 13

against receiving the vaccine, which she views as "impure." *See* Dkt. No. 29-7 at 6 (citing 1 Corinthians). This "conviction not to take the vaccine" also arose "through prayer with God." Dkt. No. 32-1 at 65.

Mr. Eshom identifies as a Christian who was "raised in both the Catholic and Assembly of God churches." Dkt. No. 29-13 at 6–7; Dkt. No. 32-2 at 4. Like his wife, he cited scripture in his original accommodation request, explaining that the use of fetal cells in the development or testing of the COVID-19 vaccines violates "[t]he sixth Commandment from God stat[ing] 'You shall not murder'," and that the vaccine would "alter his God given body" in violation of the Bible's teachings that "[i]f anyone destroys God's temple, God will destroy that person; for God's temple is sacred, and you together are that temple." Dkt. No. 29-13 at 7 (citing 1 Corinthians and Exodus 20:13). As a Catholic, Mr. Eshom admits having "asked forgiveness for all of his sins," including having received vaccines in the past. Dkt. No. 32-2 at 4. Courts have recognized similar fetal-cell objections as potentially constituting sincere religious beliefs. *See North v. Washington*, No. 3:23-CV-05552-TMC, 2025 WL 2721207, at *8 (W.D. Wash. Sept. 24, 2025) (collecting cases); *see also Detwiler*, 2025 WL 2700000, at *8 n.2 (recognizing opposition to the use of fetal cells used in developing COVID-19 vaccines as a "specific religious belief" capable of supporting Title VII claims).

The County has presented compelling evidence, however, that these purported religious convictions mask primarily secular concerns. While Ms. Eshom's testified about her "clear conviction that [she] would not need or take a vaccine that was used or created with the destruction of human life," this conviction

is undermined by her having taken Ivermectin, which, like the Pfizer and Moderna vaccines, was tested through the HEK293 fetal cell line. Dkt. Nos. 32-1 at 34, 96; 30-1 at 35–36 n.105. And when pressed, she could not cite the basis for her deeply held convictions regarding the vaccine outside of personal prayer. *Id.* at 35–36. Mr. Eshom emphasized his natural immunity as a basis for objecting to the vaccine, boasting that "within about 24 hours" of recovering from COVID-19 in 2021, he was "hiking Mount Peak in Enumclaw," having "[f]lushed [the virus] out of [his] system through exercise and hydration." Dkt. No. 32-2 at 47–48. Like his wife, he admitted to taking medicines that had been tested using HEK293 fetal cells. *See* Dkt. Nos. 32-2 at 37; 30-1 at 35–36 n.105. These admissions, among other evidence in the record, lend themselves to an inference that Plaintiffs' religious concerns are the type of "scientific and political objections to the vaccine that [they have] attempted to 'fit' to [their] religious beliefs in order to potentially qualify for a religious exemption." *Jones v. City of Seattle*, No. 2:22-CV-01668-RAJ, 2024 WL 3226748, at *5 (W.D. Wash. June 28, 2024) (quoting *Moore v. Effectual Inc.*, 3:23-cv-05210-DGE, 2024 WL 1091689, at *9 (W.D. Wash. Mar. 13, 2024)).

Even so, under Rule 56, the Court must view evidence in the light most favorable to the non-movants and cannot resolve credibility determinations or weigh competing evidence at summary judgment. *Anderson*, 477 U.S. at 255 (1986). Whether Plaintiffs' professed religious concerns were sincere or merely post-hoc rationalizations for secular concerns presents precisely the type of factual dispute that courts may not resolve on summary judgment. *Shirley v. Wash. State Dep't of*

*Fish & Wildlife*, No. 3:23-CV-05077-DGE, 2025 WL 1374977, at *10 (W.D. Wash. May 9, 2025) ("The legitimacy of these faith-based concerns are factual and credibility issues for the jury—not the Court.") (quoting *Piccolo v. Mayo Clinic*, No. CV-22-02007-PHX-DJH, 2025 WL 821773, at *8 (D. Ariz. Mar. 13, 2025)).

The Court thus finds genuine disputes of material fact preclude summary judgment on whether Plaintiffs held bona fide religious beliefs conflicting with the vaccine mandate. After all, the burden to establish a prima facie case is "not onerous." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002). But even assuming Plaintiffs could establish every element of their prima facie case at trial—a questionable proposition on this record—their claims fail because the County has shown that any accommodation would impose an undue hardship.

### 3.2.2    The County has shown that accommodating Plaintiffs' request for vaccine exemptions would impose an undue hardship.

Title VII "requires employers to accommodate the religious practice of their employees unless doing so would impose an undue hardship on the conduct of the employer's business." *Petersen*, 150 F.4th at 1216–17 (internal quotations and citations omitted). To establish an undue hardship, an employer must "show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S.

447, 470 (2023) (citation omitted). Courts must take a "common-sense" approach to assessing hardship, "tak[ing] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Groff*, 600 U.S. at 470–71 (citation modified). This includes the "aggregate or cumulative effects of an accommodation when multiple, similarly situated employees request the same accommodation." *Hailey v. Legacy Health*, No. 3:23-CV-00149-IM, 2024 WL 4253238, at *9 (D. Or. Sept. 20, 2024).

In weighing the burden imposed by an accommodation, courts may consider non-monetary "costs," including the "accommodation's effect on co-workers that may have ramifications for the conduct of the employer's business," *Groff*, 600 U.S. at 472, "any cost to an employer's mission," *see Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1151 (D. Or. 2024), or whether the accommodation "creates unreasonable safety risks, regardless of economic costs," *see Suarez v. State*, 552 P.3d 786, 799 (2024); *Rosa v. City of Issaquah in & for Washington*, No. 2:24-CV-01673-TL, 2025 WL 2733672, at *11 (W.D. Wash. Sept. 25, 2025). "Courts within the Ninth Circuit recognize that it is appropriate to confine the [undue hardship] analysis to the information available to the employer when it made its undue hardship decision." *Efimoff v. Port of Seattle*, No. C23-1307, 2024 WL 4765161, at *9 (W.D. Wash. Nov. 13, 2024) (collecting cases) (internal quotations omitted). "Numerous courts [assessing COVID-19 vaccination requirements] have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis."

*Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1136 (C.D. Cal. 2023), aff'd, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025) (collecting cases).

The County has met its burden to show that potential accommodations available—allowing Plaintiffs to continue working while unvaccinated through other mitigation measures—would have caused an undue hardship. First, Plaintiffs' roles as KCSO deputies required close contact between themselves and coworkers or the general public, which, in turn, increased the possibility of spreading COVID-19. Undersheriff Jesse Anderson, who had performed the role of a KCSO SAU "for about three years in the late 1990s," previously supervised a TSO, was responsible for overseeing all KSCO divisions, and was involved in the accommodations process. Dkt. No. 29 ¶¶ 2, 6, 25, 41. He testified that the investigations assigned to SAU detectives like Ms. Eshom, "by their very nature, require frequent and substantial in-person contact." Dkt. No. 29 ¶ 17. SAU detectives were expected to "travel to hospitals, homes, professional offices, and other similar indoor and congregate settings," and interact with victims, witnesses, KCSO employees, and members of the public. *Id.* They were also "expected to be able to respond to emergent situations to keep the peace and public safe," and was required to do so in at least one instance related to KCSO's response to the George Floyd demonstrations in May 2020. Dkt. No. 29 ¶ 23. Anderson also states that Mr. Eshom "would have interactions with the King County public, including in his official capacity," as a TFO. *Id.* ¶ 35.

Despite their arguments to the contrary, *see* Dkt. No. 37 at 39–42, Plaintiffs' testimony confirms that their jobs required in-person interaction with law enforcement officers, KCSO staff, victims, potential perpetrators, and the general

public. Ms. Eshom acknowledged that as an SAU detective it was best practice "to conduct [interviews] in-person," as discussing traumatic events such as sexual assault "require[ ] a lot of empathy and sensitivity on the part of the interviewer," which are emotions "best conveyed in person." Dkt. No. 32-1 at 19–20. Similarly, Mr. Eshom acknowledged that he was most effective while operating in person, *see* Dkt. No. 29-14 at 3, and that his role as a TFO requires him to provide "operational assistance" that required in-person contact with other KCSO employees and the public, *see* Dkt. No. 32-2 at 12–13. And, as KCSO deputies, both responded in-person to the George Floyd demonstrations. Dkt. No. 32-2 at 17 ("Q. Were you ever asked to assist in any capacity with respect to the riots as you . . . use the term? A. Yes."); *id.* at 26 (Ms. Eshom was assigned to in-person security at the sheriff's office "a handful of times" during the demonstrations). Accordingly, Plaintiffs' arguments do not contradict Defendants' evidence of an undue burden.

Second, the County has produced unrebutted evidence that Plaintiffs' proposed accommodations—masking, testing, and social distancing—were not enough to manage the heightened risk of COVID-19 transmission due to their regular contact with others. Defendant relies on Dr. Lynch's expert opinion on this score. *See generally* Dkt. No. 30. Dr. Lynch is a board-certified physician in infectious disease, Professor of Medicine at the University of Washington School of Medicine, and Associate Medical Director of Harborview Medical Center, where he is responsible for Harborview Medical Center's Infection Prevention & Control, Antimicrobial Stewardship, Employee Health, and Sepsis programs. Dkt. No. 30-1 ¶ 1. Dr. Lynch helped lead UW Medicine's COVID-19 Emergency Operations Center

1    and guided UW Medicine's response to the COVID-19 pandemic, including decisions

2    related to the school's vaccination requirement. *Id.* ¶ 2.

3        Dr. Lynch states that at the time KCSO denied Plaintiffs' accommodations,

4    "an unvaccinated person posed materially higher risks of transmitting COVID-19,

5    including increasing the potential for causing an outbreak, contracting COVID-19,

6    and developing severe disease, compared with a vaccinated person." Dkt. Nos. 30-1

7    ¶ 82; 30-2 ¶ 82. Dr. Lynch added that Plaintiffs' proposed accommodations—such as

8    masking or regular testing—were insufficient to replace the protection against

9    infection provided by vaccination. *See* Dkt. No. 30-1 ¶ 78. Even if rapid tests were

10   widely available at the time, they could fail to detect a COVID-19 infection in time

11   to prevent serious outbreaks as even weekly testing was "not frequent enough to

12   prevent an employee from reporting to work while infected with COVID-19." *Id.*

13   ¶¶ 79–80. And social distancing was insufficient to mitigate the health and safety

14   risks, as "[e]ven if an infected Detective does not enter a site they can interact with

15   and infect other County personnel who do enter those facilities and can then

16   transmit COVID-19 to others." *Id.* ¶ 83. Dr. Lynch's opinions mirror the medical

17   evidence the Ninth Circuit found persuasive in *Petersen*, where similar expert

18   testimony (by Dr. Lynch no less) established that alternative safety measures could

19   not replace vaccination. 150 F.4th at 1218–20. Plaintiffs submitted no expert

20   testimony to rebut Dr. Lynch's opinions.

21       Third, the aggregate burden of Plaintiffs' proposed accommodation was

22   substantial. Undersheriff Anderson states that allowing KCSO deputies to perform

23   remote-only work would "necessitate significant operational and budgetary

1    changes." Dkt. No. 29 ¶ 22. Losing the in-person capabilities of the 80+ KCSO

2    deputies who had requested religious accommodations would undoubtedly

3    compromise KCSO's law enforcement mission, and, by extension, the health and

4    safety of the public at large. *See*, *e.g.*, *Petersen*, 150 F.4th at 1220 (finding there to

5    be "no doubt" that accommodating 46 firefighters "would have hamstrung

6    [firefighting] operations.") (citing *Groff*, 600 U.S. at 476 (Sotomayor, J., concurring)

7    ("[F]or many businesses, labor is more important to the conduct of the business

8    than any other factor.")). And the operational cost of establishing 80 remote

9    positions is substantial, particularly when at that time "no KSCO positions

10   permitted commissioned deputies to perform their work . . . on a full time remote

11   basis." Dkt. No. 29 ¶ 12.

12        This case tracks the Ninth Circuit's recent opinion in *Petersen* beat for beat.

13   In *Petersen*, the court affirmed the esteemed Judge Thomas S. Zilly's summary

14   judgment ruling, finding that a fire department could not accommodate 46

15   unvaccinated firefighters without undue hardship. 150 F.4th at 1213. The court

16   identified three categories of substantial costs: (1) health and safety risks from

17   unvaccinated first responders who "work in group settings, interfacing constantly

18   with coworkers and the public"; (2) operational burdens from potential COVID

19   outbreaks among essential personnel; and (3) financial costs, including replacement

20   labor costs, lost contracts, and liability exposure. *Id.* at 1218–22. Each factor applies

21   with equal or greater force here. KCSO deputies, like firefighters, are public safety

22   employees whose work requires close physical proximity to their colleagues and the

23   public. Deputies arguably face even more intimate public contact when conducting

arrests, executing search warrants, and interviewing victims in confined spaces. The Ninth Circuit found "no doubt" that accommodating multiple unvaccinated first responders "would have hamstrung operations," *id*. at 1220—a conclusion that compels the same result for law enforcement personnel.

In sum, the undisputed evidence shows that allowing Plaintiffs to continue working while unvaccinated "would have come at a substantial cost" to the County. *Id*. In the context of this case, including KCSO's law enforcement mission, the close contact between KCSO deputies and the general public, the population served, and the undisputed effectiveness of vaccination policies, accommodating Plaintiffs would significantly increase the risk of COVID-19 infections to both themselves, other KCSO deputies, and the general public, thereby posing an undue hardship on KCSO. The record shows no genuine dispute that accommodating Plaintiffs via remote work would require KCSO to incur the significant operational cost of potentially losing 80 in-person deputies. The County has thus established that any accommodation would have resulted in an undue hardship.

Accordingly, the Court GRANTS summary judgment for Defendant on Plaintiffs' Title VII and WLAD failure to accommodate claims.

### 3.3    Plaintiffs' Free Exercise claims fail because the vaccine mandate was neutral and generally applicable.

The County argues that Plaintiffs' Free Exercise claims under the First Amendment and 42 U.S.C. § 1983 fail as a matter of law because "neither Eshom suffered a constitutional deprivation under the neutral and generally applicable vaccine mandate." Dkt. No. 28.

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST. amend. I. In assessing a Free Exercise claim, the Court must first determine what level of scrutiny to apply. Rational basis review applies to neutral laws of general applicability, while strict scrutiny applies to those which are not neutral and/or which are not generally applicable. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685–86 (9th Cir. 2023). A law is not generally applicable if, even "in pursuit of legitimate interests," it "in a selective manner impose[s] burdens only on conduct motivated by religious belief." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). In contrast, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531 (citing *Employment Div., Dept. of Human Res. of Oregon v. Smith*, 494 U.S. 872, 878–79 (1990)).

The County's vaccine mandate was unquestionably neutral and generally applicable. It was "neutral because it neither infringes upon nor restricts practices because of their religious motivation," and "generally applicable, as it facially applies to all relevant employees unless they can show that they are legally entitled to an exemption." *Bacon v. Woodward*, No. 22-35611, 2024 WL 3041850, at *1 (9th Cir. June 18, 2024) (citing *Lukumi*, 508 U.S. at 533; *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1177–78, 1180 (9th Cir. 2021)). This determination is in accord with rulings made by courts throughout the Ninth Circuit and across the country. *See* Dkt. No 28 at 43 n.16 (collecting cases holding "that government-issued

1    mandates during the COVID-19 pandemic requiring employee vaccination are

2    neutral laws of general applicability"). Thus, the Court applies rational basis

3    review.

4         Under rational basis review, the mandate need only be "rationally related to

5    a legitimate governmental purpose." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064,

6    1084 (9th Cir. 2015). The County's stated purpose here was to "protect the health

7    and welfare of County personnel and those they serve." Dkt. No. 28 at 43. This was

8    reflected in the mandate's text, which sought to protect the "King County employees

9    [who] provide services, often in-person, to protect life, health and safety," from

10   contracting COVID-19. Dkt. No. 31-2 at 2. *See also* Dkt. No. 31-1 at 2

11   (announcement from Executive Constantine stating that "[a]s government

12   employees, many of us work directly with the public. We have an obligation to keep

13   our customers safe. We also want our colleagues to be as safe as possible. The need

14   for our services remains as urgent as ever during the pandemic, essential for the

15   people we serve. Our work needs to go on. Full vaccination is the answer."). This

16   Court joins the chorus of other judicial voices in finding that "intent to safeguard

17   individuals from COVID-19 is a legitimate interest—by now a well-established fact

18   of law." *Rosa v. City of Issaquah in & for Washington*, No. 2:24-CV-01673-TL, 2025

19   WL 2733672, at *26 (W.D. Wash. Sept. 25, 2025) (collecting cases).

20        Plaintiffs do not dispute the mandate's legitimacy, but allege instead that the

21   exemption process was a "sham" because "the County never intended to grant

22   religious accommodations." Dkt. No. 37 at 44. This is incorrect. While the County

23   did not provide accommodations to any *KCSO* employees, including Plaintiffs, it is

ORDER GRANTING SUMMARY JUDGMENT - 24

undisputed that hundreds of *County* employees received temporary accommodations under the exemption process. Dkt. No. 48-3 at 8–9. In any event, on a rational-basis review, Plaintiffs "have the burden to negat[e] every conceivable basis that might support [the rules]," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (internal quotation marks omitted), which they have failed to do here.

The Court finds that the vaccine mandate was rationally related to a legitimate governmental purpose and thus satisfies Constitutional scrutiny. Accordingly, the Court GRANTS summary judgment on Plaintiffs' Free Exercise claims.

### 3.4    Plaintiffs received all process due to them under the Fourteenth Amendment.

Finally, the County argues that Plaintiffs' Due Process claims under the Fourteenth Amendment and 42 U.S.C. § 1983 fail as a matter of law because they both received ample notice and an opportunity to be heard. Dkt. No. 28 at 46.

"The essential requirements of due process . . . are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). "To meet this requirement, the state must provide pre-termination notice with an explanation of its evidence, and an opportunity for the employee facing discharge to respond, either orally or in writing." *Caraway v. Town of Columbus*, 765 F. App'x 374 (9th Cir. 2019).

The undisputed record shows that Plaintiffs received comprehensive procedural protections throughout and after the accommodations process and before termination. They received notice of the vaccine mandate, promptly requested

exemptions via the accommodation process, chose to complete that process via written responses rather than a virtual meeting, and were eventually denied exemption and accommodations. The County then notified them of their potential termination due to non-compliance with the vaccine mandate, and provided them with at least one *Loudermill* hearing, before terminating their positions at KCSO. This is all the process which they were due. *See Bacon v. Woodward*, No. 22-35611, 2024 WL 3041850, at *2 (9th Cir. June 18, 2024) (holding no due process violation where firefighters had been given "advance notice of the vaccination requirement, were offered the opportunity to participate in *Loudermill* hearings, and were communicated the results of those hearings"). That Plaintiffs disagree with the outcome does not transform the process into a constitutional violation.

Accordingly, the Court GRANTS summary judgment on Plaintiffs' Due Process claims.

## 3.5    The Court declines to rule on Defendant's motion for sanctions.

The County moves for spoliation sanctions against Mr. Eshom, alleging he failed to preserve electronically stored information on at least two personal cell phones. Dkt. No. 52. For relief, the County seeks an adverse inference instruction about the sincerity of Mr. Eshom's religious beliefs. *Id.* at 2. It also seeks its attorney's fees and costs incurred due to the failure to preserve. *Id.*

Parties and counsel have a fundamental obligation to preserve relevant evidence once litigation is reasonably anticipated. *See* Fed. R. Civ. P. 37(e). Mr. Eshom was aware of his duty to preserve electronic and other evidence by at least

January 2023. Dkt. No. 58 ¶ 13. According to the County's unrebutted evidence, however, Mr. Eshom failed to preserve text and Signal messages spanning March 2022 through December 2024—over two and a half years of potentially relevant communications. *Id.* at 2. The pattern presented suggests, at minimum, negligent if not intentional conduct: Mr. Eshom's first phone was damaged without backup in July 2023, his second phone maintained a 30-day auto-delete feature throughout litigation, and he replaced that phone immediately before scheduled imaging without preserving its contents. *See* Dkt. No. 54 ¶¶ 8–10; Dkt. No. 59 ¶¶ 6–7.

The Court finds these preservation failures deeply troubling, but because summary judgment disposes of all claims on the merits, the Court declines to rule on the motion. Any spoliation-based adverse inference would serve no practical purpose, and while the conduct may be sanctionable, the Court exercises its discretion to deny fee-shifting given the case's resolution. See *Gebrehawariat v. Seattle City Light*, No. C18-128 RSM, 2019 WL 3387445, at *2 (W.D. Wash. July 26, 2019) (the court has "broad discretion in the crafting of appropriate sanctions" under Rule 37) (citing *Liew v. Breen*, 640 F.2d 1046, 1050 (9th Cir. 1981)). The dismissal itself provides more than enough remedy. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) (principle of judicial restraint requires courts to avoid reaching unnecessary collateral matters).

Accordingly, the County's Motion for Sanctions is DENIED as moot. This denial should not be construed as condoning the apparent failure to preserve presented here.

## 4. CONCLUSION

In sum, the Court ORDERS the following:

1. Defendant's motions for summary judgment, Dkt. No. 28 (Case No. 2:24-cv-00007) and Dkt. No. 49 (Case No. 2:23-cv-00028), are GRANTED. Plaintiffs' claims are DISMISSED with prejudice.

2. Defendant's motions to exclude Plaintiff's expert, Dkt. No. 26 (Case No. 2:24-cv-00007) and Dkt. No. 47 (Case No. 2:23-cv-00028), are DENIED as moot.

3. Defendant's motion for sanctions, Dkt. No. 52 (Case No. 2:24-cv-00007), is DENIED as moot.

Dated this 14th day of November, 2025.

Jamal N. Whitehead
United States District Judge